JAMES J. CRAVEN, JR. vs. STATE ETHICS COMMISSION.

Suffolk.  April 7, 1983. — September 20, 1983.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Due Process of Law*, Proceedings before State Ethics Commission, Standard of proof. *Administrative Law*, Proceedings before agency, Substantial evidence. *Conflict of Interest. State Ethics Commission.*

In proceedings before the State Ethics Commission, the chairman's alleged participation in investigative and adjudicatory capacities did not deprive a public official of his right to due process of law, even assuming that the chairman had participated in the decision authorizing a preliminary inquiry into the conduct of the official and the issuance of an order to show cause, in addition to sitting as the hearing examiner and taking part in the final decision. [195-199]

Application of a preponderance of the evidence standard rather than a clear and convincing standard of proof in proceedings before the State Ethics Commission against a public official charged with violations of the conflict of interest law, G. L. c. 268A, did not violate the official's constitutional right to due process of law. [199-201]

There was substantial evidence in the record of a proceeding before the State Ethics Commission to support the commission's conclusions that a member of the House of Representatives had violated both G. L. c. 268A, § 6, prohibiting a State employee from participating in a particular matter in which he or a member of his immediate family has a financial interest, and G. L. c. 268A, § 23 (*d*), providing that no employee of the State shall use or attempt to use his official position to secure unwarranted privileges or exemptions for himself or others. [201-202]

CIVIL ACTION commenced in the Superior Court Department on July 18, 1980.

The case was heard by *Carey*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Lawrence F. O'Donnell* (*William R. O'Donnell* with him) for the plaintiff.

*Robert V. Greco* for the defendant.

O'CONNOR, J.  The plaintiff, James J. Craven, Jr., appeals from a judgment of the Superior Court which affirmed a decision of the State Ethics Commission (commission). The commission had found that the plaintiff violated certain provisions of the conflict of interest law, G. L. c. 268A, and had assessed a civil penalty of $1,000.  We transferred the case to this court on our own motion.  The plaintiff argues on appeal that the judgment of the Superior Court should be reversed and the decision of the commission set aside on the grounds that (1) he was denied due process of law because the chairman of the commission acted in both an investigative and adjudicatory capacity during the proceedings before the commission, (2) he was denied due process of law because the commission improperly applied only a preponderance of the evidence standard of proof in its proceedings, and (3) the decision of the commission is unsupported by substantial evidence.  We disagree with all the plaintiff's contentions.  Accordingly, we affirm the judgment.

We summarize the relevant facts found by the commission.  The plaintiff has been a member of the Massachusetts House of Representatives and a member of its Ways and Means Committee (committee) since 1957.[1]  The committee evaluates and makes recommendations to the House on the budget requests of all State agencies.  These recommendations carry great weight with the House membership.

In 1976, the plaintiff assisted in the formation of the Jamaica Plain Community Development Foundation, Inc. (JPCDF), by recruiting persons in the Hispanic community to serve on its board of directors.  JPCDF was incorporated in April, 1977.  The first executive director of JPCDF was Cornelius Joseph Doyle.

In the late summer or fall of 1978, the plaintiff assisted JPCDF in its efforts to obtain government funds by advising persons associated with the organization of the availability

---

[1] The plaintiff submits in his brief that he has been a member of the committee from 1958 through 1962 and from 1966 to the present.

of grant monies in the budgets of the Department of Youth Services (DYS) and the Department of Community Affairs (DCA), which is a State agency within the jurisdiction of the Executive Office of Communities and Development (EOCD). He also arranged and attended a meeting between the Commissioner of DYS and representatives of JPCDF. In December, 1978, JPCDF was awarded an $18,000 contract by DYS. That contract was cancelled in June, 1979.[2]

In August or September, 1978, the plaintiff arranged and attended a meeting at the offices of the committee. Also attending the meeting were Doyle, William Flynn, then the secretary of EOCD, and Paul Collis, then Flynn's legislative assistant. At this meeting, the plaintiff recommended that JPCDF be funded by EOCD. Flynn advised the plaintiff that there were several EOCD programs, including the Urban Reinvestment Study (URS) Program, under which JPCDF could apply for funding.

In November, 1978, the plaintiff attended another meeting with Flynn in the committee's offices. Several other State legislators representing sections of Boston also attended this meeting. The subject of the meeting was the funding by EOCD of community development groups in Boston. Flynn advised those present that there were three EOCD programs, including the URS program, under which Boston groups could apply for funding.

During this period, DCA was implementing a $150,000,000 program which could not proceed to the actual construction phase until the committee approved DCA's schedule. This schedule was pending before the committee at the time of these two meetings. At this time, Flynn was aware that the plaintiff was a member of the committee.

On November 21, 1978, the plaintiff attended a meeting at the DCA offices in Boston. Also attending the meeting were Doyle, two professionals who were to conduct research

---

[2] In the spring of 1979, JPCDF was also tentatively awarded one $40,000 contract and one $24,500 contract by the city of Boston. Both awards, however, were subsequently cancelled.

for JPCDF in the event that it received a URS grant from DCA, and Gerald Tuckman and Jeanne Myerson, two DCA staff members who would review any proposal submitted by JPCDF for a URS grant. At this meeting, Tuckman described the "Request for Proposals" for the department's URS grants and explained that this request had been circulated to a number of groups throughout the State. The plaintiff strongly pressed the DCA staff members to award a URS grant to JPCDF and indicated that the DCA budget might be affected adversely if an award were not made. Tuckman was concerned about the plaintiff's comments and reported the conversation to his immediate supervisor, David Entin. Entin subsequently advised EOCD Secretary Flynn and the assistant secretary, Gerald W. Hayes, of the plaintiff's reference to the DCA budget. Hayes was aware that certain schedules of DCA programs were awaiting approval by the committee and consequently became concerned about the plaintiff's comments.

On December 1, 1978, JPCDF submitted to DCA a proposal for a URS grant. DCA received six other proposals for the $30,000 available in URS monies. All seven proposals were evaluated. As a result of these evaluations, the DCA staff submitted to Secretary Flynn a recommendation that three of the groups receive grants, in the amount of $10,000 each. The staff did not recommend that JPCDF receive funding because JPCDF had not proposed strategies to overcome declining financial investment in the community as required in the request for proposals for funding.

Hayes later informed Entin that he had discussed the URS proposals with Flynn and that they had decided to fund two of the groups recommended but not the third group. Hayes explained that he and Flynn had decided instead to commit funds to JPCDF subject to an improvement in JPCDF's proposal to meet the program requirements. The contacts made by the plaintiff with EOCD officials regarding JPCDF and the concern generated by those contacts about the implications for the DCA budget in the event that JPCDF was not awarded funding were major factors in the decision to commit funding to JPCDF.

Doyle and the plaintiff were notified by letter dated January 2, 1979, from Secretary Flynn that an award of $10,000 in URS monies had been approved, subject to two alterations in the program design. The contract between DCA and JPCDF for the award of $10,000 in URS monies was signed on April 30, 1979.

On May 5, 1977, the plaintiff and four of his brothers established the Celtic Realty Trust. The plaintiff and these brothers were named as beneficiaries of the trust. Albert Buchwald, who was then serving as president of JPCDF, and John Lawless, a director of JPCDF, were named as trustees of the trust. At about the same time, the trust purchased a building located at 2-16 Hyde Park Avenue, Jamaica Plain, known as the Minton Building. In the fall of 1977, the plaintiff assigned his twenty per cent beneficial interest in the trust to his daughter. The other four beneficial interests remained in the plaintiff's brothers throughout 1978 and 1979.

During the fall of 1978, it was the intention of JPCDF to use some portion of the URS grant, if received, to pay rent on office space in the Minton Building.[3] The plaintiff had been aware of this intention when meeting with EOCD officials. JPCDF paid to the Celtic Realty Trust $490 in rent from the URS grant monies for the month of June, 1979. JPCDF subsequently received notice from Tuckman not to make further expenditures of URS grant monies.

1. The plaintiff's first argument is that he was denied due process of law because the chairman of the commission assumed both an adjudicatory and an investigative function in the proceedings before the commission. Since the plaintiff's argument to a large extent challenges the statutory scheme under which the commission operates, we briefly discuss the relevant provisions.

---

[3] In addition, the proposal submitted to DCA by JPCDF for URS funds contemplated the expenditure of some portion of the grant monies on overhead expenses. The contract awarded to JPCDF authorized these expenditures.

The commission, which was created by St. 1978, c. 210, § 20, is authorized to "act as the primary civil enforcement agency" of G. L. c. 268A, the conflict of interest law, and G. L. c. 268B, the financial disclosure law. G. L. c. 268B, §§ 2, 3. General Laws c. 268B, § 4, establishes certain procedures by which the commission may investigate and remedy alleged violations of these statutes. Under § 4 (*a*), the commission may initiate a confidential preliminary inquiry into any alleged violations. Section 4 (*c*) provides that "[i]f a preliminary inquiry indicates reasonable cause for belief that [the statutes have] been violated, the commission may, upon a majority vote, initiate a full investigation and appropriate proceedings to determine whether there has been such a violation." Section 4 (*c*) further provides in relevant part that "[a]ny member of the commission . . . may hear testimony or receive other evidence in any proceeding before the commission." Section 4 (*c*) also provides that, after the adjudicatory proceedings are completed, "the commission shall meet in executive session for the purpose of reviewing the evidence before it. . . . [And then the commission] shall publish a written report of its findings and conclusions." The hearing officer does not make findings of fact. Rather, the full commission makes both the findings of fact and the conclusions of law.

In the case at bar, an order to show cause was issued on November 29, 1979, alleging that the plaintiff had violated G. L. c. 268A, §§ 2 (*b*), 6, and 23 (*d*). On March 10 and 11, 1980, an evidentiary hearing was held before the chairman of the commission. On June 18, 1980, the commission issued its decision and order, in which the chairman participated. In this decision, the commission made extensive findings of fact and concluded that the plaintiff had violated G. L. c. 268A, §§ 6 and 23 (*d*), but had not violated § 2 (*b*).

We agree with the plaintiff that "[a] fair trial in a fair tribunal is a basic requirement of due process," *In re Murchison*, 349 U.S. 133, 136 (1955), and that due process requires "the resolution of contested questions by an impartial and disinterested tribunal," *Amos Treat & Co.* v. *SEC*, 306 F.2d

260, 264 (D.C. Cir. 1962), quoting *Berkshire Employee Ass'n of Berkshire Knitting Mills* v. *NLRB,* 121 F.2d 235, 238 (3d Cir. 1941). See *Withrow* v. *Larkin,* 421 U.S. 35, 46-47 (1975). The plaintiff argues that his right to due process was violated in this case because of the chairman's alleged participation in both the investigative and adjudicatory aspects of the proceedings before the commission. The plaintiff suggests that in addition to sitting as the hearing officer and participating in the final decision, the chairman participated in the decisions to commence a preliminary inquiry and to issue an order to show cause. There is nothing in the record, however, which demonstrates that the chairman participated in either the decision to initiate a preliminary inquiry or the decision to issue an order to show cause. In its brief, the commission suggests that, as a matter of course, it authorizes a preliminary inquiry but that the investigation itself is conducted by the staff with a report made to the commission. The record in this case does not reveal which members of the commission authorized the preliminary inquiry with regard to the plaintiff. In addition, the order to show cause was signed by Robert J. Cordy, associate general counsel of the commission, and not by the chairman. Although G. L. c. 268B, § 4 (*c*), provides that a majority vote of the commission is necessary for such an order to issue, there is no evidence in this record as to which members voted. Notwithstanding these factual deficiencies, we shall assume for purposes of responding to the plaintiff's argument that the chairman, in addition to sitting as the hearing examiner and taking part in the final decision, participated in the decisions authorizing a preliminary inquiry and the issuance of an order to show cause. We are unpersuaded, however, that there has been any improper combination of investigative and adjudicatory functions.

In *Raymond* v. *Board of Registration in Medicine,* 387 Mass. 708, 714-717 (1982), we recently addressed similar contentions. In *Raymond,* the plaintiff maintained that certain procedures followed by the board in revoking his certificate of registration to practice medicine improperly

combined investigative and adjudicatory functions. *Id.*
Specifically, he argued error in that (1) the member of the
board who moved that an order to show cause be served
upon him was thereafter appointed hearing officer and con-
ducted the hearing, (2) counsel who brought and argued the
complaint was employed by the board, (3) before the hear-
ing was held, all board members, including the hearing offi-
cer, had access to investigatory materials collected in the
plaintiff's file, and (4) one or more of the board members
who participated in the decision to issue the order to show
cause also participated in the final decision. *Id.* at 714-715.
We concluded that these facts did "not demonstrate such a
risk of prejudice or immutable adherence to a position un-
favorable to [Raymond] as to preclude a hearing that met
the constitutional requirements of due process." *Id.* at 717.
We relied on *Withrow v. Larkin*, 421 U.S. 35 (1972), where
the United States Supreme Court determined: "The mere
exposure to evidence presented in nonadversary investiga-
tive procedures is insufficient in itself to impugn the fairness
of [an agency's] members at a later adversary hearing.
Without a showing to the contrary, state administrators 'are
assumed to be men of conscience and intellectual discipline,
capable of judging a particular controversy fairly on the
basis of its own circumstances.'" *Id.* at 55, quoting *United
States v. Morgan*, 313 U.S. 409, 421 (1941). *Raymond,
supra* at 715-716.

The reasoning of *Raymond* controls the case at bar. This
case is similar to *Raymond* in that the plaintiff complains
that the member of the commission who sat as hearing offi-
cer also participated in the decision to issue the order to
show cause. Unlike *Raymond*, however, the plaintiff sub-
mits that this same member of the commission participated
in the initial decision authorizing a preliminary inquiry and
in the final decision. It was not alleged in *Raymond* either
that the hearing officer participated in the final decision of
the board or authorized a preliminary inquiry, although it
was contended that one or more of the board members, not
necessarily the hearing officer, participated in the decision

to issue the order to show cause and also participated in the final decision.  Even if it had been alleged in *Raymond* that the same board member who sat as the hearing officer and participated in the decision to issue an order to show cause also authorized a preliminary inquiry and participated in the final decision, the result that we reached in *Raymond* would not have been altered.

The fact that the chairman of the commission was involved at these various stages of the proceedings before the commission does not demonstrate a substantial risk of an unfair decision-making process due to bias or prejudgment. Mere authorization of a preliminary investigation did not improperly involve the chairman in the investigatory stage, particularly where it appears that neither the chairman nor the commission actually conducted the investigation but rather members of the staff of the commission did.  Furthermore, the chairman's participation in the final decision was not improper.  Each member of the commission had a copy of the transcript of the evidentiary hearing.  Each member of the commission participated in making both the findings of fact and the legal conclusions.  Although the other members of the commission may have accorded the chairman some deference on matters of credibility, the possibility of such deference being given does not in itself rise to the level of a constitutional violation.  Following the lead of *Withrow, supra,* without a showing to the contrary, we assume that State administrators are impartial and fair in performing their duties.  Thus, we conclude that the proceedings before the commission did not deprive the plaintiff of due process.

2. We also reject the plaintiff's argument that he was denied due process because the commission applied an improper standard of proof.  According to the plaintiff, the commission should have been held to a clear and convincing standard of proof because criminal sanctions could be imposed for the conduct with which the commission charged him.  We note, however, that the commission itself does not have the power to impose criminal sanctions.  Rather, the

commission's enforcement powers are civil in nature; it may only require that a civil penalty be paid or issue a cease and desist order. See G. L. c. 268B, § 4 (d).

Proof by a preponderance of the evidence is the standard generally applicable to administrative proceedings. See *Tartas's Case*, 328 Mass. 585, 586-587 (1952); *Fairfax Hosp. Ass'n* v. *Califano*, 585 F.2d 602, 611-612 (4th Cir. 1978); *Kephart* v. *Richardson*, 505 F.2d 1085, 1089-1090 (3d Cir. 1974). The Supreme Court has required proof by clear and convincing evidence in a very limited number of cases where "particularly important individual interests or rights are at stake." *Herman & MacLean* v. *Huddleston*, 459 U.S. 375, 389 (1983). See, e.g., *Santosky* v. *Kramer*, 455 U.S. 745 (1982) (proceedings to terminate parental rights); *Addington* v. *Texas*, 441 U.S. 418, 423-424 (1979) (involuntary commitment); *Woodby* v. *Immigration & Naturalization Serv.*, 385 U.S. 276, 285-286 (1966) (deportation). The Court has concluded, however, that "imposition of even severe civil sanctions that do not implicate such interests has been permitted after proof by a preponderance of the evidence." *Herman & MacLean* v. *Huddleston, supra* at 389-390. See, e.g., *id.* (preponderance of evidence standard suffices in civil action for recovery for alleged violations of antifraud provisions of Securities Exchange Act of 1934, § 10[b], 15 U.S.C. § 78j[b] [1976]); *Steadman* v. *SEC*, 450 U.S. 91 (1981) (preponderance of evidence standard suffices in SEC administrative proceedings concerning alleged violations of antifraud provisions where sanctions imposed included an order permanently barring petitioner from practicing his profession); *United States* v. *Regan*, 232 U.S. 37, 48-49 (1914) (preponderance of evidence standard suffices in civil suits involving proof of acts that expose a party to a criminal prosecution). See also *Matter of Ruby*, 328 Mass. 542, 547 (1952) (disbarment). Since the sanctions which the commission may impose in a proceeding under G. L. c. 268B, § 4, do not implicate the type of interests or rights at stake in cases such as *Santosky, supra, Addington, supra,* or *Woodby, supra,* a preponderance of the evidence standard

is constitutionally permissible. See *Herman & MacLean, supra* at 389-390. The plaintiff also contends that he was denied due process because the chairman allegedly did not inform the plaintiff until the second day of the hearing what the standard of proof would be. Since the plaintiff does not argue that this failure to inform him of the standard prejudiced him in any way, we do not address this contention.

3. The plaintiff's final argument is that the decision of the commission is "[u]nsupported by substantial evidence." G. L. c. 30A, § 14 (7) (*e*). Substantial evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6), inserted by St. 1954, c. 681, § 1. "We note the limited nature of our review under the substantial evidence standard. Although we must examine the entire record, including any evidence that detracts from the weight of the [commission's] decision . . . we may not substitute our judgment for that of the [commission] . . ." (citations omitted). *1001 Plays, Inc.* v. *Mayor of Boston,* 387 Mass. 879, 885 (1983).

The commission found that the plaintiff violated G. L. c. 268A, § 6, which prohibits a State employee from participating[4] in a particular matter[5] in which he or a member of his immediate family[6] has a financial interest. The commission also found that the plaintiff violated G. L. c. 268A, § 23 (*d*), as amended through St. 1975, c. 508, which provides in relevant part that no employee of the State shall

---

[4] "Participate" is defined in § 1 (*j*) of G. L. c. 268A, as appearing in St. 1962, c. 779, § 1, as to "participate in agency action or in a particular matter personally and substantially as a state . . . employee, through approval, disapproval, decision, recommendation, the rendering of advice, investigation or otherwise."

[5] "Particular matter" is defined in § 1 (*k*), as appearing in St. 1962, c. 779, § 1, as "any judicial or other proceeding, application, submission, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, decision, determination, finding, but excluding enactment of general legislation by the general court."

[6] "Immediate family" is defined in § 1 (*e*), as appearing in St. 1962, c. 779, § 1, as the State employee and his spouse and "their parents, children, brothers and sisters."

"use or attempt to use his official position to secure unwarranted privileges or exemptions for himself or others."

There is substantial evidence in the record to support both of these conclusions. The commission could reasonably have found that the plaintiff used his position as a member of the Massachusetts House of Representatives Ways and Means Committee to exert pressure on the EOCD officials to award the URS contract to JPCDF, and that the plaintiff knew that JPCDF intended to pay some portion of that award as rent to a trust of which members of his immediate family were beneficiaries. Thus, there was substantial evidence before the commission that the plaintiff violated G. L. c. 268A, §§ 6 and 23 (d). Accordingly, the judgment of the Superior Court is affirmed.

*So ordered.*